STATE of Minnesota, Respondent,

v.

A.C. JACKSON, Appellant.

No. A08–0001.

Court of Appeals of Minnesota.

April 28, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Mitchell L. Rothman, Assistant County Attorney, St. Paul, MN, for respondent.

Lawrence Hammerling, Chief Appellate Public Defender, G. Tony Atwal, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by STAUBER, Presiding Judge; MINGE, Judge; and CONNOLLY, Judge.

## OPINION

CONNOLLY, Judge.

On appeal from his conviction of attempted first-degree aggravated robbery, appellant argues that the district court's admission of a firearm-trace report through the testimony of a police officer who did not perform the trace or prepare the report, violated his Sixth Amendment right to confrontation under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Because the firearm-trace report was not prepared for purposes of litigation, and is therefore not testimonial in nature under *Crawford,* we affirm.

## FACTS

Appellant A.C. Jackson challenges his conviction of attempted first-degree aggra-

vated robbery in violation of Minn.Stat. §§ 609.245, subd. 1 (2006) (first-degree aggravated robbery); 609.17, subd. 1 (2006) (attempt).

J.W. owns and operates the Beehive Tavern in St. Paul. J.W. testified that he was alone in the bar on March 25, 2007, and that shortly before 5:00 p.m., three masked men entered the bar through the rear door and shouted, "This is a stick up." One of the three men had a shotgun and raised it at J.W. who was armed with a handgun and immediately fired seven bullets at the men. As J.W. fired, all three men left the bar and J.W. called 911. J.W. testified that he could not give a physical description of the individual with the shotgun because the man was wearing a red and blue mask and a sweatsuit. There were several local residents who witnessed the incident at the Beehive Tavern from their homes or apartments.

Police officers arrived within minutes of the incident and began talking to residents who were on the street to learn what had happened. The residents stated that the man who had the shotgun was in the alley that runs parallel to Fremont Street and East Third Street. Officer Carl Schwartz drove one block east to Cypress Street and entered the alley and saw a man walking by himself. Officers Ryan Murphy and Jay Griffin entered the alley at Forest Street and walked east. When Officer Murphy saw appellant, he told Officer Schwartz that appellant was the man police were seeking. Appellant ignored the officers' orders to stop and put his hands in the air and instead went behind the bed of a truck parked in the alley. Officer Murphy could see appellant's upper body and shoulder move and he heard objects hit the ground. Appellant came out from behind a truck and police took him into custody. The officers found two yellow, .20–gauge shotgun shells next to the pickup truck. Police found four shells of the same gauge and color in the pocket of appellant's sweatshirt. When asked why he was in the neighborhood, appellant replied that he was there "to do a little target practice."

J.W. and two of the residents each identified appellant as the man holding the shotgun before, during, and after the attempted robbery. Specifically, J.W. testified that although he could not make a facial identification of appellant as the man holding the shotgun during the attempted robbery, he could identify appellant by his clothing. One of the residents testified that after the attempted robbery, she saw the man who was holding the shotgun and his mask slid. The witness testified that when the mask slid, she saw that the man was white, had gray hair, a gray mustache, and a beard. This witness further testified that she did not see the masked man's face, but identified appellant as the armed man by his clothing, gray hair, and facial hair. Another witness testified that he could identify appellant as the man holding the shotgun by his haircut, hair style, and clothing, and stated that the only difference between appellant and the man holding the shotgun was that "he [did not] have his mask or his weapon with him." The police found the ski mask allegedly dropped by appellant in a yard on Forest Street. Police also found a .20–gauge shotgun propped against a tree on Fremont Street. The shotgun had a live round in its chamber and three live rounds in its magazine. Police did not find the two other men who participated in the attempted robbery.

At trial, five eyewitnesses testified that the sweatshirt appellant was wearing when he was arrested resembled the one they saw the man with the shotgun wearing. Six eyewitnesses testified that the dropped ski mask looked like the mask the man with the shotgun wore. Two witnesses testified that the shotgun recovered by

police resembled the one they saw the masked man holding. One witness identified appellant as the man who fled from the Beehive Tavern with the shotgun because he had his mask off at that time and the witness also recognized appellant's haircut.

Sergeant Tina Kill, who investigated appellant's case, also testified for the state. On direct examination, the prosecution did not question Sergeant Kill about who owned the gun or who possessed it on the date of recovery, March 25, 2007. On cross-examination, defense questioned Sergeant Kill about whether she had determined who owned the shotgun. Sergeant Kill testified that appellant did not own the gun.

> DEFENSE COUNSEL: Sergeant Kill, in your follow-up with ... the shotgun here, were you ever able to determine who that belonged to?
>
> SERGEANT KILL: Yes.
>
> DEFENSE COUNSEL: And who was that?
>
> SERGEANT KILL: Off the top of my head, I don't recollect the name. We did a BCA[1] check.
>
> DEFENSE COUNSEL: Let me ask you this: Was it A.C. Jackson?
>
> SERGEANT KILL: No.

On redirect, the state established the purpose of running the BCA check.

> THE STATE: How do you determine firearm ownership?
>
> SERGEANT KILL: Run a BCA check with the weapon registration.
>
> THE STATE: And they actually then go to the Department [of] Alcohol, Tobacco and Firearms, right?
>
> SERGEANT KILL: Yes.
>
> THE STATE: What is the purpose of running such a check?
>
> SERGEANT KILL: To check who originally purchased the weapon and/or if it

is a stolen weapon, and also they can compare that weapon with previous weapons used in a crime.

> . . . .
>
> THE STATE: What do you recognize Exhibit 8 to be?
>
> SERGEANT KILL: This is the results from the firearm summary.
>
> THE STATE: This is actually a copy, correct?
>
> SERGEANT KILL: Correct.
>
> THE STATE: It's a true and correct copy?
>
> SERGEANT KILL: Yes.
>
> THE STATE: I would offer Exhibit 8, Your Honor.
>
> DEFENSE COUNSEL: No objection.
>
> THE COURT: Exhibit 8 is received.
>
> THE STATE: Who's Don [Grundhauser]?
>
> SERGEANT KILL: He's an officer who's assigned to the gun unit.
>
> THE STATE: In the St. Paul Police Department?
>
> SERGEANT KILL: Correct.
>
> THE STATE: And is he the one that's responsible for actually asking for a trace?
>
> SERGEANT KILL: Yes.
>
> THE STATE: And that's why his name appears on the report?
>
> SERGEANT KILL: Yes.
>
> THE STATE: What does this show in terms of purchaser information?
>
> SERGEANT KILL: That the weapon was purchased by a Roberta Elvecrog from Aitkin, Minnesota, date of birth 11/27/1957.
>
> THE STATE: And then it says "recovery information?"
>
> SERGEANT KILL: Yes.
>
> THE STATE: What does that indicate?
>
> SERGEANT KILL: We recovered it at 937 East Third Street on 3/25/2007

---

**1.** Bureau of Criminal Apprehension.

THE STATE: And who does it show the possessor as?

SERGEANT KILL: A.C. Jackson.

THE STATE: What is the purchase date that Ms. Elvecrog ... what date did she purchase the gun?

SERGEANT KILL: April 7, 1990.

THE STATE: Why doesn't this indicate what happened to the gun between the time she purchased it and between the time it was recovered on March 25th, 2007?

SERGEANT KILL: Because they're only obligated to record who purchases the weapon [and] through what dealership. And the shotgun can be kept at home and basically given to anyone you so desire.

THE STATE: So any trace like this is going to show who originally purchased it from whom, purchase date and where it was ultimately recovered?

SERGEANT KILL: Yes.

The jury found appellant guilty of attempted first-degree aggravated robbery. The district court ordered appellant to serve the presumptive sentence, a 44–month prison term. This appeal follows.

### ISSUES

I.  Did admission of a firearm-trace report through testimony of a police officer who did not perform the firearm trace or prepare the firearm-trace report violate appellant's Sixth Amendment right to confrontation under *Crawford?*

II.  Did the district court err with respect to the other issues raised by appellant?

### ANALYSIS

### I.

■ Appellant argues that he is entitled to a new trial because the admission of testimonial hearsay evidence based on a firearm-trace report violated his rights under the Confrontation Clause. U.S. Const. amends. VI, XIV; Minn. Const. art. I, § 6; *see also Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374. The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees that every criminal defendant "shall enjoy the right ... to be confronted with the witnesses against him." The Supreme Court interpreted this clause to bar the admission of "testimonial statements" made by a declarant out of court, unless the declarant is "unavailable to testify at trial, and the defendant has had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53–54, 124 S.Ct. at 1365. Generally, we will not reverse a district court's evidentiary rulings absent a clear abuse of discretion. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn.2006). "But whether the admission of evidence violates a criminal defendant's rights under the Confrontation Clause is a question of law this court reviews de novo." *Id.* Appellant did not object to the firearm-trace report's admission; therefore, we review it for plain error. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998).

There is no dispute that the firearm-trace report contains out-of-court statements, and that appellant did not have the opportunity to cross-examine either the report's preparer, or the officer who requested the report for a file, Officer Grundhauser. Thus, the threshold question for the confrontation-clause analysis is whether the firearms-trace report was testimonial in nature. *Crawford*, 541 U.S. at 51–52, 124 S.Ct. at 1364.

#### A.  *The firearm-trace report is not testimonial in nature.*

■ The Supreme Court in *Crawford* left "for another day any effort to spell out

a comprehensive definition of 'testimonial.'" *Id.* at 68, 124 S.Ct. at 1374. But courts have recognized three generic categories of testimonial statements outlined by the Supreme Court including (1) ex parte in-court testimony or its functional equivalent, (2) extrajudicial statements contained in formalized materials, and (3) statements that were made under circumstances that would lead an objective witness to believe reasonably that the statement would be available for use at a later trial. *Caulfield*, 722 N.W.2d at 308 (citing *Crawford*, 541 U.S. at 51–52, 124 S.Ct. at 1364). The state has the burden to prove that the firearms-trace report was not testimonial in nature. *See id.* To determine whether a statement is testimonial, courts consider whether it was prepared for purposes of litigation. *Id.* at 309.

Here, the firearm-trace report was not created for litigation purposes but instead is a record that is maintained in the normal course of business at the Bureau of Alcohol, Tobacco, and Firearms (ATF). There is also an argument that the firearm-trace report qualifies for the business records exception and therefore, the report is not testimonial under *Crawford*. *See Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367 (noting that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial-for example, business records"). But we recently rejected an analysis that the protection under the Confrontation Clause turns solely on the nature or scope of a particular hearsay exception. *State v. Johnson*, 756 N.W.2d 883, 891 (Minn.App.2008) (noting that, under *Crawford*, the Supreme Court would not view all statements admissible under the business-records exception as automatically being non-testimonial and concluding that an autopsy report is testimonial). In *Caulfield*, the Minnesota Supreme Court explained that the focus should not be on a particular statement's reliability. 722 N.W.2d at 309–10. Instead, the supreme court was persuaded by a line of cases whose focus was on whether the declarant would reasonably expect the statement to be used prosecutorially, and whether a statement was made under circumstances that would lead an objective witness to reasonably believe the statement would be available for trial. *Id.* at 310 (citing *Shiver v. State*, 900 So.2d 615, 618 (Fla.Dist.Ct.App.2005)).

The firearm-trace report existed to track the gun's ownership and possession. The declarant did not expect that the firearm-trace report would be used prosecutorially. In addition to the fact that the firearm-trace report was not created for purposes of litigation, we also note that the firearm-trace report was not used to prove that appellant was armed with a shotgun during the robbery attempt. Instead, the state only offered it on redirect to rebut the defense's assertion that appellant was not the gun's owner. We note that the two cases appellant relies on to argue that the firearm-trace report is testimonial, *Caulfield*, 722 N.W.2d 304, and *State v. Weaver*, 733 N.W.2d 793 (Minn.App.2007), *review denied* (Minn. Sept. 18, 2007) are distinguishable.

*Caulfield* involved a Bureau of Criminal Apprehension (BCA) report that identified the substance found on defendant as cocaine. 722 N.W.2d at 306–07. The Minnesota Supreme Court held that the report, which was admitted without supporting testimony, was testimonial hearsay. *Id.* at 309 (finding that "[t]he report functioned as the equivalent of testimony on the identification of the substance seized from Caulfield."). "*Crawford* mandated that all testimonial statements be excluded unless the declarant is unavailable to testify at trial and the defendant has had a prior opportunity to cross-examine the declarant." *Id.* at 308. BCA reports are "the

types of statements about which the Court in *Crawford* expressed concern-affidavits and similar documents admitted in lieu of present testimony at trial." *Id.* at 309. The supreme court explained that the BCA lab report bore characteristics of each of the three generic descriptions offered by the Supreme Court in *Crawford* and that the lab analyst who submitted the report attested her findings. *Id.* And the report was prepared at the request of the officer for purposes of prosecuting the defendant. *Id.*

The firearm-trace report in this case is distinguishable from the BCA lab report in *Caulfield* because the trace report was not created to aid the state in the prosecution of appellant. Instead, the data in the trace report had been on file at the ATF for 17 years-since the shotgun was originally purchased. Although the data were printed in the form of a report at the request of a police investigator to have on file after appellant's arrest, we conclude that because the information existed notwithstanding the police officer's request for a printed report, the officer's request did not amount to a request to create a report to serve as evidence in a criminal case, unlike the laboratory analysis in *Caulfield.*

In *Caulfield,* the substance to be tested in the laboratory was seized from Caulfield by a police officer as part of an investigation, and the BCA report was introduced by the state at trial to prove beyond a reasonable doubt that the substance was cocaine. *Id.* The firearm-trace report is different. Although the gun was found by police propped against a tree, the state did not use the trace report to prove beyond a reasonable doubt that the gun was found in appellant's possession on the date of the crime. The report simply contained the

following information about (1) who purchased the gun; (2) that it was recovered on March 25, 2007 at the Beehive Tavern [2]; and (3) that appellant was listed as having possessed the gun at the time of its recovery. Although the witness, Sergeant Kill, testified that the exhibit was a true and correct copy of the generated firearm-trace report, the contents of the report were not attested to and no one affirmed that the information contained in the report was correct. These circumstances are unlike those surrounding the BCA lab report in *Caulfield.*

The second case that appellant relies on to support his argument, *Weaver,* involved a hospital laboratory report prepared as part of an autopsy. 733 N.W.2d at 800. The *Weaver* court relied on *Caulfield* to arrive at its conclusion that the evidence was testimonial. *Id.* at 799–800 (noting that a medical examiner has duties independent of the police and of criminal investigations generally, but emphasizing that "a homicide investigation had been started in which the carbon-monoxide testing would likely provide relevant evidence"). The blood samples were sent to the laboratory after appellant had been arrested as a suspect for arson. *Id.* at 800.

In *Weaver,* the laboratory results were obtained during the course of the homicide investigation, the medical examiner relied on the results to reach her conclusion on the victim's cause of death, and the information was relayed to the jury in lieu of testimony. *Id.* at 799. In other words, the lab report was "presented in a way that was designed to secure the state's verdict." *Id.* at 801 (quotation omitted). Additionally, in *Weaver,* we determined that the laboratory test results were "highly persuasive," had "the appearance of be-

---

**2.** The firearm-trace report contains a disclaimer at the bottom, which reads, "The information in this report must be validated prior to use in any criminal proceedings."

ing conclusive proof" of the cause of death, and they were not merely cumulative of the other evidence. *Id.* (quotations omitted). By contrast, the data forming the substance of the firearm-trace report in this case was compiled at the time of the gun's purchase. It was not initiated after appellant's charge as part of an investigation. Further, the state did not rely on the firearm-trace report to prove that the gun was in appellant's possession, rather it was only introduced on redirect to respond to defense counsel's questioning about the gun's ownership.

Even if the firearm-trace report had been offered as proof that appellant possessed the gun, the mere fact that a record may be introduced in a criminal prosecution to prove an element of the crime does not mean the record was created for that purpose or that it is testimonial. *See State v. Vonderharr,* 733 N.W.2d 847, 852–53 (Minn.App.2007). In *Vonderharr,* we determined that certified copies of Department of Public Safety (DPS) records showing the defendant's license status were not prepared for the purposes of prosecution and therefore, did not implicate appellant's confrontation-clause rights. *Id.* at 852. We noted in *Vonderharr,* that DPS records are "significantly different from the laboratory report that was at issue in *Caulfield*" because they were not prepared for the purpose of prosecuting Vonderharr. *Id.* "The records were produced before Vonderharr was charged and even before the incident that lead to him being charged occurred." *Id.*

Although the information regarding the gun's possession at the time it was recovered on March 25, 2007 was added after the attempted robbery, the firearm-trace report in this case is more akin to the DPS report in *Vonderharr* than to the BCA report in *Caulfield* or the laboratory test in *Weaver.*

Because the firearm-trace report was not prepared for purposes of litigation, and the state did not rely on the report to prove an element of the crime, we conclude that it is not testimonial in nature. Thus, the report did not implicate a defendant's right to confrontation under *Crawford* and it was not reversible error to admit the firearm-trace report without a showing of unavailability and a prior opportunity for cross-examination.

**B. Even if the firearm-trace report were testimonial so as to make its admission plain error, it did not affect appellant's substantial rights.**

In general, the failure to object to the admission of evidence constitutes a waiver of the issue on appeal. *State v. Vick,* 632 N.W.2d 676, 684 (Minn.2001). We may exercise discretion to consider an issue, however, if it constitutes plain error or a defect affecting substantial rights of appellant, even if such issue was not brought to the attention of the district court. *Griller,* 583 N.W.2d at 740; Minn. R.Crim. P. 31.02. "The plain error standard requires that the defendant show: (1) error; (2) that was plain; and (3) that affected substantial rights." *State v. Strommen,* 648 N.W.2d 681, 686 (Minn. 2002) (citing *Griller,* 583 N.W.2d at 740). "If those three prongs are met, we may correct the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted). The burden is on appellant to show that the district court committed a "plain error" that prejudiced his case by admitting the reports. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993).

We have already concluded that because the firearm-trace report was not prepared for purposes of litigation, it is not testimonial and did not implicate appellant's right

to confrontation under *Crawford.* Therefore, admission of the firearm-trace report did not constitute plain error. Notwithstanding this conclusion, we address appellant's argument that admission of the firearm-trace report significantly affected the verdict because the state presented the firearm-trace report "in a manner which could not have been lost on the jury." Appellant argues that in order to convict appellant of first-degree aggravated robbery, the state was required to prove beyond a reasonable doubt that appellant possessed the shotgun. Appellant further argues that the firearm-trace report and Sergeant Kill's testimony conclusively provided this element of proof and both were designed to secure the guilty verdict. *See Caulfield,* 722 N.W.2d at 314; *Weaver,* 733 N.W.2d at 801.

In *Caulfield,* the supreme court held that the erroneous admission of the lab report was not harmless even though Caulfield admitted the substance found in his possession was cocaine and field tests of the substance indicated the same. *Caulfield,* 722 N.W.2d at 314–17.[3] In evaluating the reasonable likelihood that the erroneously admitted evidence significantly affected the verdict, this court must consider the persuasiveness of that evidence. *See Caulfield,* 722 N.W.2d at 317 (stating that the supreme court has never held that the admission of "direct and persuasive evidence on an element of the crime" was harmless solely because "other less direct and less persuasive or largely circumstantial evidence is strong"). We note that, in light of other witnesses' testimony linking appellant to the gun, the firearm-trace report in this case is not the only persuasive evidence introduced to prove the necessary elements of the crime of which appellant was convicted. Our analysis must also consider the manner in which the evidence was presented. Significantly, the state did not mention the firearm-trace report in its opening or closing arguments. In fact, the state did not offer the report into evidence until the redirect of Sergeant Kill. This indicates that the state did not intend to introduce the evidence in its case-in-chief and did not rely upon the trace report to prove that appellant possessed the gun on March 25, 2007. Accordingly, the firearm-trace report was not presented in a manner that gave it significant focus.

Contrary to appellant's argument, it appears unlikely that the trace report affected the verdict because it was presented in a tangential manner on redirect solely for purposes of disputing appellant's contention that he was not the gun's "owner"; the report was not highly persuasive because it stated that the contents needed to be affirmed, and they were not affirmed by Sergeant Kill's testimony; and the state neither used the report in its case-in-chief nor referred to it during opening statement or closing argument. Appellant has not presented a compelling argument that admission of the firearm-trace report affected his substantial rights.

We conclude that the district court's admission of the firearm-trace report without the testimony of the person who prepared the report or the officer who requested a printed copy did not constitute testimonial hearsay and therefore, did not constitute plain error. But even if the firearm-trace report were testimonial hearsay and its admission "plain error," the report's admission did not affect appellant's substan-

---

**3.** Because the defendant objected to the admission of laboratory test results, *Caulfield* invoked harmless error rather than plain error. Both doctrines, however, involve an analysis of the effect of the error on substantial rights. *Compare* Minn. R.Crim. P. 31.01 *and* 31.02.

tial rights. Because appellant has failed to demonstrate that admission of the firearm-trace report affected his substantial rights, consideration of whether the correction of the unobjected-to error is required to ensure the fairness and integrity of the judicial process is unnecessary.

## II.

■ Appellant raises additional arguments in his pro se brief. They fail. Specifically, appellant argues that the district court erred by failing to give the jury an aiding-and-abetting instruction. It is within the district court's discretion to decline to give a jury instruction that is unsupported by the evidence. *State v. Volk*, 421 N.W.2d 360, 365 (Minn.App.1988) (explaining that there was no evidence to support an instruction for heat of passion manslaughter and affirming the district court's conclusion that there was no basis to give a manslaughter instruction), *review denied* (Minn. May 18, 1988). We conclude that the evidence was consistent with the charge of attempted first-degree aggravated robbery, and the district court did not err by failing to give the jury an aiding-and-abetting instruction. Appellant also argues his trial counsel had a conflict of interest based on appellant's belief that the Ramsey County Public Defender's Office had represented two of the state's witnesses. Appellant fails to demonstrate that his trial counsel actively represented conflicting interests, and accordingly, he has not established the factual predicate for his claim. *See Cuypers v. State*, 711 N.W.2d 100, 104 (Minn.2006) (stating that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim" (quotation omitted)). Likewise, appellant's arguments that (1) he had a right to have a jury determine his parole status in 2004, and (2) the complaint's cover page contained a ty-pographical error that rendered it defective are without merit.

## DECISION

In sum, we hold that because the firearm-trace report was not prepared for purposes of litigation and is not testimonial in nature, its admission did not implicate appellant's right to confrontation under Crawford.

**Affirmed.**