STATE of Minnesota, Respondent,

v.

Brandon M. JOHNSON, Appellant.

No. A07–1189.

Court of Appeals of Minnesota.

Oct. 14, 2008.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

Lawrence Hammerling, Chief Appellate Public Defender, G. Tony Atwal, Assistant State Public Defender, St. Paul, MN, for appellant.

Considered and decided by SHUMAKER, Presiding Judge; STONEBURNER, Judge; and HUSPENI, Judge.

## O P I N I O N

HUSPENI, Judge.*

This appeal is from a conviction of and sentence for second-degree intentional murder and several counts of attempted murder. Appellant challenges the admission of the autopsy report and the exclusion of defense evidence concerning his mental condition. He also challenges the jury instructions and the sufficiency of the evidence to support conviction on two counts, as well as the consecutive sentences imposed. Because we conclude there was no reversible trial error and the evidence is sufficient to support the conviction on all counts, we affirm the conviction. But we reverse the consecutive sentences and remand for imposition of concurrent sentences on the two counts of attempted second-degree murder.

## FACTS

Appellant Brandon Johnson was convicted of multiple counts of murder and attempted murder arising out of the shooting death of his girlfriend, Sheila Hollie, and the gunshot injuries to her niece, N.H., and daughter, L.H., as well as for pointing a gun at an infant grandson of Hollie. The incident occurred on the evening of October 14, 2005, at the home that Johnson shared with Hollie.

N.H., who was in the bedroom across the hall from where Hollie was shot, testified that earlier in the evening Johnson seemed to be acting normally. Later, however, she noticed him pacing around the house and heard him arguing with Hollie. N.H. testified that Hollie went to her bedroom across the hall, with Johnson following her. She then heard a closet or drawer open and then a gunshot. N.H. testified that she then saw Johnson shoot L.H., who was in the same bedroom as N.H., twice, then point the gun at her and fire two shots, which struck her. When Johnson pointed the gun at the baby, J.M.-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

L., with whom N.H. was playing, she moved in front of the baby and was shot once in the chest.

H.J., Hollie's sister, who lived on the same block, testified that her mother, who lived next door to Hollie, called her, saying "Brandon just shot [N.H.]." H.J. testified that she ran to the house, where she attended to N.H. She heard her father confront Johnson, who was in the basement of the house, saying "Man, what are you doing?" According to H.J., Johnson responded, "They're disrespecting me." H.J. also testified that N.H. told her, "Brandon shot me." The state introduced the 911 call that H.J. made to police, reporting that the shooter was in the basement of the house.

J.H., the father of Hollie and H.J., testified that his wife woke him up and told him that Johnson had shot N.H. J.H. then went next door to the scene of the shooting and saw Hollie lying on the floor. He testified that he yelled down to Johnson in the basement, asking why he had done it, and Johnson responded angrily that "they disrespected me," and sounded angry when he said this.

L.H. testified that Hollie had left the house earlier in the evening to pick up her son, R.H., at work. She returned and told Johnson that R.H. had to work late. L.H. then heard Johnson "trying to start an argument with her again." She heard Hollie telling him to leave her alone and to go back downstairs. When Hollie left again and returned with R.H., Johnson again tried to start an argument with her. When Hollie returned to her bedroom, Johnson again began arguing with her.

L.H. testified that Hollie told Johnson, "Do what you always do." Johnson said, "Okay" and walked to a closet, which he opened, reaching in for something. L.H. then heard a sound, and Johnson turned around to face Hollie, then "he just fired off the shot." L.H. testified that Johnson fired a single shot, then turned around to face her, smiling at her before firing a shot at her. Johnson continued walking toward her, fired again, and she was hit by a bullet. He then fired at N.H., hitting her, and then turned the gun on J.M.-L., L.H.'s infant son. But N.H. covered the baby and was struck by the bullet. Johnson left the room momentarily before returning and hitting L.H. with two more shots.

Defense counsel cross-examined L.H. about how many times she thought she had been shot, including when "he" was in Hollie's bedroom, and whether she had been antagonizing "him" or showing "him" any disrespect. Counsel did not question L.H.'s testimony that Johnson was the shooter.

The state presented the testimony of Andrew Baker, M.D., the Hennepin County Medical Examiner, whose office conducted the autopsy of Hollie. The autopsy was performed by two other examiners in the office.

Dr. Baker testified concerning Hollie's alcohol concentration and the cocaine metabolite in her blood. Dr. Baker conceded that cocaine use could be fatal and that the risk of fatality could not be correlated directly to the amount of cocaine in the system. He also testified that he was unaware of any way "based on a level in somebody's system to determine how they might be behaving or manifesting."

Dr. Baker described the entrance wound and the pathway of the single bullet that struck Hollie, stating that the bullet entered her upper chest, passed through her left lung, and struck the left ventricle of her heart. Dr. Baker testified that "[t]he likelihood of death if you suffer a gunshot wound to your left ventricle would be very high." He testified that he could not tell from the autopsy alone what position the victim was in when she was shot.

Defense counsel only briefly cross-examined Dr. Baker concerning the gunshot

wound to Hollie. But he questioned Dr. Baker at some length about the behavioral effects of cocaine, eliciting from him that cocaine users "may get agitated or belligerent or combative," but that "everybody reacts differently." On redirect, the prosecutor clarified that someone could use cocaine and "not have any of those effects." He then elicited Dr. Baker's reiteration of his opinion that Hollie died from a gunshot wound and not from cocaine.

The defense sought to present the testimony of Ernest Boswell, Ph.D., who performed a psychological evaluation of Johnson and concluded that Johnson suffers from a pervasive personality disorder that includes avoidant personality disorder and dysthymic disorder, a chronic mood disturbance. The district court ruled that Dr. Boswell could not testify about either avoidant personality disorder or dysthymic disorder, which the court found were "the psychological equivalent of diminished capacity." The court did allow Dr. Boswell to testify about "the defendant's alcohol dependence and family of origin issues." Dr. Boswell testified at some length about the topic of mental and personality disorders and about Johnson's dependence on alcohol.

Johnson testified in his own defense, stating that he had no independent recollection of shooting Hollie. He testified, however, that based on the police reports and the testimony he had heard, he believed that he had shot and killed Hollie and that he had shot L.H. and N.H. He denied that anyone had upset him that day or that he had had any thoughts about shooting anyone. He testified that he was not denying that he had committed the offenses and that he felt bad for what he had done to the Hollie family. Johnson testified that he had met with Dr. Boswell, but the court sustained the state's objection to a question whether he believed that

he had a mental disorder. Defense counsel did question Johnson at length, however, about the family problems he experienced while growing up.

The jury acquitted Johnson of first-degree premeditated murder in the death of Hollie but found him guilty of second-degree intentional murder. The jury also found Johnson guilty of attempted first-degree murder of L.H. and attempted second-degree murder of both J.M.-L. and N.H. The district court sentenced Johnson to 290 months for second-degree murder, which was within the presumptive sentence range, 183 months for attempted first-degree murder, 165 months for the attempted second-degree murder of N.H., and 135 months for the attempted second-degree murder of J.M.-L. The district court ordered that the sentences run consecutively.

## ISSUES

1. Was Johnson's right to confrontation violated by admission of the autopsy report without testimony from the physicians who performed it?

2. Is there sufficient evidence to support the convictions of attempted intentional murder of the infant and the attempted first-degree murder of L.H.?

3. Did the district court err in failing to define the crime of assault?

4. Did the district court abuse its discretion, and deny Johnson's right to present a defense, by barring defense expert testimony on appellant's personality disorder?

5. Did the district court err in sentencing Johnson to consecutive sentences for the offenses against two of the victims?

## ANALYSIS

### I.

 Johnson argues that the admission of the autopsy report, without the testimo-

ny of either of the two physicians who performed the autopsy, violated his right to confrontation under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). He argues that an autopsy report is "testimonial" and, therefore, under *Crawford,* cannot be admitted unless the declarant testifies or there has been a prior opportunity to cross-examine the declarant. This appears to be an issue of first impression in Minnesota, although this court held in *State v. Weaver,* 733 N.W.2d 793, 800 (Minn.App.2007), *review denied* (Minn. Sept. 18, 2007), that a laboratory test result ordered as part of an autopsy was "testimonial."

 Evidentiary rulings lie within the discretion of the district court and will not be reversed absent a clear abuse of discretion. *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003). But whether the admission of evidence violates the Confrontation Clause is a question of law subject to de novo review. *State v. Warsame,* 735 N.W.2d 684, 689 (Minn.2007). Johnson did not object to the admission of the autopsy evidence; therefore, we review it for plain error. *See State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998).

The Supreme Court in *Crawford* held that statements from witnesses who do not testify at trial are not admissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant if the statements are "testimonial." 541 U.S. at 59, 124 S.Ct. at 1369. The Court did not define the scope of "testimonial" statements.

The leading Minnesota case on the application of *Crawford* to scientific tests is *State v. Caulfield,* 722 N.W.2d 304 (Minn. 2006), in which the supreme court held that a BCA laboratory report identifying a substance as cocaine was testimonial. The court identified the critical factor as being whether a statement "was prepared for litigation." *Caulfield,* 722 N.W.2d at 309. The court concluded that the BCA report "was clearly prepared for litigation." *Id.* In reaching this conclusion, the court noted that the BCA report was performed at the request of police "as part of an investigation into ... suspected drug dealing," and after the police had field-tested the substance, after they had "preliminarily determined that it was cocaine," and after they had arrested the defendant. *Id.* Thus, the process leading to prosecution was well underway. And the *Caulfield* court rejected the state's argument that because BCA analysts "play a nonadversarial role and are removed from the prosecutorial process," the laboratory report was non-testimonial. *Id.*

As noted above, this court held in *Weaver* that a hospital laboratory report prepared as part of an autopsy report was testimonial. 733 N.W.2d at 800. The *Weaver* court relied heavily on the *Caulfield* conclusion, while acknowledging some differences:

> We note that the medical examiner has duties independent of the police and of criminal investigations generally, unlike the BCA. But here a homicide investigation had been started in which the carbon-monoxide testing would likely provide relevant evidence, although not evidence as clearly decisive as the drug testing in *Caulfield.*

*Id.* at 799–800 (citation omitted). The court also noted that "the blood samples were sent to the laboratory after police and the medical examiner had preliminarily determined that arson had occurred and after appellant had been arrested as a suspect." *Id.* at 800. The *Weaver* opinion did not distinguish between the role of the medical examiner and the role of the hospital laboratory technician who actually performed the test, and, therefore, was the declarant in that case.

*Weaver* discounts the significance to the *Crawford* analysis of the medical examiner's independent statutory duties, at least where those duties are performed after a homicide investigation has begun. *Id.* at 799. Thus, the state's reliance on Minn. Stat. § 390.11, subd. 1 (2004), the medical examiner's statutory mandate, and the number of non-homicide-related autopsies is not supported by this court's analysis in *Weaver.* The *Weaver* opinion could be read as limited to cases in which a homicide investigation has begun. But here it was apparent from the police arrival on the scene that Hollie's death was a homicide. Johnson was arrested at the scene. And the autopsy was not performed until approximately 33 hours after death, by which time a homicide investigation presumably had begun.

The supreme court gave more weight to statutory non-investigative duties in *State v. Krasky,* 736 N.W.2d 636 (Minn.2007), in which it held that statements made by a child to a nurse in the course of a child-sex-abuse investigation were not testimonial. In *Krasky,* the court concluded that "the primary purpose of [the child]'s statements to [the nurse] was to assess and protect [the child]'s health and welfare," and not to investigate a suspected crime. *Id.* at 641. The court cited the mandatory-reporting statute and its expression of public policy to protect children whose health or welfare may be at risk due to physical or sexual abuse. *Id.* at 642. But the medical examiner's statutory duties, spelled out in Minn.Stat. § 390.11, subd. 1, do not include such an urgent statement of public purpose. *See* Minn.Stat. § 390.11, subds. 1 (requiring prompt report of all "sudden or unexpected deaths" to be made to the medical examiner), 2 (authorizing medical examiner to order an autopsy when, in his or her judgment, "the public interest would be served by an autopsy") (2006). And the statute requires the medi-

cal examiner to send autopsy reports to the county attorney "in any cases of a potential criminal nature." *Id.,* subd. 9 (2006). Therefore, we conclude that the medical examiner's statutory duties are not sufficiently independent of a police investigation to make an autopsy report non-testimonial.

We recognize, and the state stresses, that the greater weight of authority from other jurisdictions is that autopsy reports are not testimonial under *Crawford.* Several of these cases rely, however, on an initial conclusion that an autopsy report is a business record and, therefore, admissible under an exception to the rule against hearsay. These cases refer to a brief comment in *Crawford* that seems to exclude business records from being treated as "testimonial" statements. *See Crawford,* 541 U.S. at 56, 124 S.Ct. at 1367 (noting that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records....").

A leading case adopting the business-records approach to autopsy reports is *United States v. Feliz,* 467 F.3d 227 (2d Cir.2006). The Second Circuit in *Feliz* disagreed with several state court decisions that had treated the *Crawford* statement quoted above as dictum. 467 F.3d at 233. The *Feliz* court held "that a statement properly admitted under Fed.R.Evid. 803(6) [the business records exception] cannot be testimonial because a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence." *Id.* at 233–34 (footnote omitted). The court stated: "We know that because Rule 803(6) requires business records to be kept in the regular course of a business activity, records created in anticipation of litigation do not fall within its definition." *Id.* at 234 (citation

omitted). The *Feliz* court acknowledged that "any medical examiner preparing such a report must expect that it *may* later be available for use at trial." *Id.* at 235. But the court rejected the view that the "reasonable expectation" of the medical examiner, as the declarant, should control whether statements are considered testimonial and held that an autopsy report, as a business record, is non-testimonial under *Crawford,* despite the declarant's awareness that it may be used at trial. *Id.* at 234–36. In support of its conclusion that autopsy reports qualify as business records, the court noted that the medical examiner's office "conducts thousands of routine autopsies every year without regard to the likelihood of their use at trial." *Id.*

Other courts have followed similar reasoning in concluding that autopsy reports are not "testimonial" under *Crawford. See United States v. De La Cruz,* 514 F.3d 121, 133 (1st Cir.2008) (holding that autopsy report on cause of drug user's death, used to support sentence enhancement, was not "testimonial" but rather a business record); *People v. Moore,* 378 Ill.App.3d 41, 316 Ill.Dec. 751, 880 N.E.2d 229, 236 (2007) (relying on Illinois statute that treated autopsy reports as business records); *State v. Russell,* 966 So.2d 154, 165 (La.Ct.App. 2007) (relying on Louisiana statute making reports admissible to prove death and cause of death, and singling out "routine, descriptive, non-analytical, and thus, non-testimonial" information in the autopsy report); *cf. Rollins v. State,* 392 Md. 455, 897 A.2d 821, 839, 845–46 (2006) (holding autopsy reports are not "per se testimonial" but may be testimonial if they contain "contested opinions or conclusions" that are "central to the determination of the defendant's guilt").

■ We conclude that the protection offered by the Confrontation Clause should not turn on the nature or scope of a particular hearsay exception, or on statutory provisions. Indeed, much of the reasoning of the cases cited above has been criticized as "strain[ed]," and as reintroducing through the "back door" of the business-records exception the *Roberts* reliability factor rejected in *Crawford.* Matthew Yanovitch, *Dissecting the Constitutional Admissibility of Autopsy Reports after Crawford,* 57 Catholic Univ. L.Rev. 269, 288 (2007). Another commentator criticizes the *Feliz* analysis as "incorrect" and its arguments as "makeweights." Thomas F. Burke, III, *The Test Results Said What? The Post–Crawford Admissibility of Hearsay Forensic Evidence,* 53 S.D. L.Rev. 1, 19 (2008).

The comment in *Crawford* that much of the *Feliz* reasoning is based on appears in the context of a historical discussion of the state of the hearsay rule at the time the Bill of Rights was being considered. In that discussion, Justice Scalia acknowledges that exceptions to the hearsay rule were recognized at the time. 541 U.S. at 56, 124 S.Ct. at 1367. And he points out that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, *business records* or statements in furtherance of a conspiracy." *Id.* (emphasis added). He concludes by stating, "We do not infer from these that the Framers thought exceptions would apply even to prior testimony." *Id.*

We cannot conclude that the Supreme Court would view all statements currently allowed into evidence under the business-records exception as being non-testimonial. Further, we have found no Minnesota cases determining that autopsy reports fit within the business-records exception. And this court determined in *Weaver* that a laboratory-test report prepared as part of an autopsy was "testimonial" under

*Crawford.* We conclude, in light of *Caulfield* and *Weaver,* that the district court committed plain error in allowing the state to present the autopsy report through Dr. Baker, who was not one of the medical examiners who performed the autopsy.

 Our analysis, however, does not end with the determination that it was error to allow testimony concerning the autopsy report. The plain-error test also requires that we determine whether the error affected Johnson's substantial rights. *Griller,* 583 N.W.2d at 740. An error affects substantial rights if it is prejudicial and affects the outcome of the case. *State v. Ihle,* 640 N.W.2d 910, 917 (Minn.2002).

The autopsy report described Hollie's single gunshot wound. But there was abundant evidence establishing the fact that Hollie was shot.[1] Indeed, given the evidence that several other shots were fired shortly after and that these shots struck two other people, the jury could not have reached any other conclusion based on the other evidence presented.

We note that the defense did not significantly question the state's theory that Johnson was the shooter. Defense counsel did not cross-examine to any significant degree either L.H. or N.H., the eyewitnesses to the shooting, regarding their claim that Johnson fired a single gunshot at Hollie following an argument. In his opening statement, defense counsel appeared to concede that Johnson fired the shot that killed Hollie, as well as the ensuing gunshots that struck N.H. and L.H. Counsel described Johnson's painful psychological history, his state of intoxication, and his feeling before the incident that he

was again being rejected, likening these to the elements causing an explosion. Counsel stated, "This explosion ended the life of Sheila Hollie." Counsel did not outline any challenge to the eyewitness testimony identifying Johnson as the shooter. And Johnson himself admitted on the stand that, although he had no independent recollection of the crime, the evidence established that he fired the shot that killed Hollie.

The record indicates that the defense gained a benefit from the autopsy evidence, in the form of evidence of Hollie's recent cocaine use and its possible effects on her demeanor, that outweighed any prejudice it may have suffered from the admission of the bare, uncontested facts concerning the cause and nature of her death through the testimony of one who did not personally conduct the autopsy. Thus, we conclude that the error in admitting the autopsy evidence did not prejudice Johnson's substantial rights and that a new trial is not required on that basis.

## II.

Johnson argues that the evidence is insufficient to support his convictions of attempted second-degree murder against J.M.-L. and attempted first-degree murder against L.H. He does not challenge the sufficiency of the evidence to prove that he shot Hollie or that this shooting constituted second-degree murder.

 In reviewing the sufficiency of the evidence, this court conducts a painstaking review of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is

---

1. The autopsy report introduced as an exhibit did not include the usual conclusions as to the cause and manner of death. Dr. Baker, however, testified that Hollie's death was caused by a gunshot wound, and that the manner of her death was homicide. Although Dr. Baker was subject to cross-examination regarding these conclusions, because the conclusions had no basis other than the autopsy report, we will assume that they implicate Johnson's right of confrontation.

sufficient to allow the fact-finder to reach the verdict it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). This court must assume that the fact-finder believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989).

 N.H. and L.H. each testified that Johnson pointed the gun at J.M.-L., although N.H. had moved over to cover the baby before the shot was fired. The credibility of witness testimony is within the exclusive province of the jury. *State v. Bliss*, 457 N.W.2d 385, 390 (Minn.1990). Assuming, as this court must, that the jury believed N.H. and L.H., their testimony as to the aiming of the gun, along with their testimony that a shot was fired shortly after that struck N.H., who was covering J.M.-L., was sufficient for the jury to conclude that Johnson intended the death of J.M.-L. and that he took a substantial step toward committing second-degree murder. *See generally State v. Berg*, 358 N.W.2d 443, 446 (Minn.App.1984) (holding that evidence that appellant threatened the two victims, pointed a gun at one, and fired shots through the door was sufficient to support conviction for attempted second-degree murder), *review denied* (Minn. Feb. 5, 1985).

 Johnson's argument challenging his conviction of attempted premeditated murder of L.H. rests on his analysis of the evidence concerning the number of shots fired and his implicit claim that he could not have premeditated L.H.'s death unless he returned to the room to shoot her again after the initial three shots. But this argument ignores the case law holding that multiple shots can establish premeditation. *See State v. Moua*, 678 N.W.2d 29, 41 (Minn.2004). And there was evidence from which the jury could have concluded that more than five shots were fired in total, despite the fact that only five shell casings were found by police.

## III.

 Johnson also argues that the district court abused its discretion in declining to define "assault" in the jury instructions. Our review of the record indicates that Johnson objected to this omission only after the jury had retired to deliberate. The state concedes that it was error to fail to define "assault" in instructing the jury on the lesser offenses. *See State v. Vance*, 734 N.W.2d 650, 656–57 (Minn.2007) (holding that it was error to fail to give "the underlying definition of assault" in defining third-degree assault.) The state is correct, however, in urging that this issue should be reviewed under the plain-error test because Johnson did not object before the jury began deliberations. *See id.* at 654–55 (holding that failure to object to instructions before they are given generally forfeits appellate review, except for plain error).

 We conclude that the error did not affect Johnson's substantial rights because: (1) defense counsel took advantage of the lack of a definition of "assault" to argue that because the infant, J.M.-L., was too young to perceive any threat, it was not an assault; and (2) the jury did not return guilty verdicts on the lesser-included offenses, the charges that required a finding that assault occurred.

There is no merit to appellant's argument that the jury could have convicted him of the lesser-included offense of second-degree assault with a dangerous weapon if it had been properly instructed on the definition of "assault," including the element of intent. He presents no authority, and no convincing argument, establishing that a jury is more likely to find guilt if confronted with the requirement of finding an additional element, or an element more

thoroughly defined. *Cf. id.* at 661–62 (concluding that failure to instruct that assault required intentional infliction of bodily harm was prejudicial where jury found defendant guilty of third-degree assault). We conclude that the omission of an instruction that logically would have made it more difficult for the jury to find Johnson guilty of the lesser offenses did not prejudice him.

## IV.

Johnson also argues that the district court abused its discretion and denied his right to present a complete defense, by ruling inadmissible any defense expert testimony concerning Johnson's personality disorder(s). The admission of expert opinion testimony rests within the district court's discretion and will not be reversed absent an abuse of that discretion. *State v. Griese,* 565 N.W.2d 419, 425 (Minn. 1997).

Johnson did not present a mental-illness defense, and he presented no record indicating he could satisfy the *M'Naghten* standard for the mental-illness defense. Instead, defense counsel argued that Dr. Boswell should be allowed to testify that Johnson's personality disorder, combined with his post-traumatic-stress disorder (PTSD) and his state of intoxication, prevented him from premeditating Hollie's death. Counsel argued that the jury needed help in assessing that combination of factors, and Dr. Boswell's testimony, therefore, would be helpful to the trier of fact. *See generally* Minn. R. Evid. 702. Dr. Boswell's conclusion, however, was that Johnson does not suffer from PTSD. Neither did he have any pre-offense diagnosis of a major mental disorder. Dr. Boswell could not conclude, after the offense and Johnson's lengthy incarceration, that he was suffering from any psychosis or other major mental disorder.

The general rule in Minnesota is that psychiatric opinion testimony is not admissible in the guilt phase of a criminal trial. *See State v. Provost,* 490 N.W.2d 93, 101 (Minn.1992) (noting that psychiatric opinion testimony is not admissible "on whether, in fact, the defendant had the capacity to form the requisite subjective state of mind"). The court in *Provost,* however, left the door open for the admission of such testimony when the defendant "has a past history of mental illness" or "to explain a particular mental disorder characterized by a specific intent different from the requisite mens rea." *Id.* at 103–04. But, as noted above, Johnson had no past history of mental illness. And he did not claim that his personality disorder(s) caused him to think in a way inconsistent with either premeditation or intent.

Thus, Johnson made no showing that the *Provost* exceptions would apply so as to permit Dr. Boswell's testimony. Nevertheless, Dr. Boswell did testify, at some length, although in general terms, about mental disorders and personality disorders and Johnson's alcohol dependence. And defense counsel argued that Johnson "has a fragile psyche. He's had a troubled past and has had many problems." Defense counsel argued that the jury should find Johnson guilty only of first-degree heat-of-passion manslaughter, based on his "fragile psyche," his intoxication, and his anger at Hollie for using crack cocaine. We conclude that the district court did not abuse its discretion in limiting Dr. Boswell's testimony.

## V.

Finally, Johnson argues that the district court erred in imposing consecutive sentences on the two counts of attempted second-degree intentional murder. This court reviews de novo the district court's interpretation of the sentencing

guidelines. *State v. Coleman*, 731 N.W.2d 531, 534 (Minn.App.2007), *review denied* (Minn. Aug. 7, 2007).

Consecutive sentencing is permissive when there are multiple current felony convictions for crimes listed in section VI of the guidelines. Minn. Sent. Guidelines II.F. As Johnson points out, although second-degree intentional murder is listed in section VI, *attempted* second-degree intentional murder is not. Minn. Sent. Guidelines VI. Therefore, Johnson argues, consecutive sentencing is not permissive, but, rather, a departure that in this case is not supported by any finding of aggravating factors.

▮ The guidelines formerly provided for permissive consecutive sentencing for "crimes against different persons." *See State v. Ford*, 539 N.W.2d 214, 230 (Minn. 1995) (citing Minn. Sent. Guidelines II. F.02). But section II.F. was later amended to allow permissive consecutive sentencing for identified crimes listed in a separate table in section VI. Minn. Sent. Guidelines II.F. Section VI lists "Conspiracy/Attempted Murder in the First Degree" as an offense for which permissive consecutive sentences may be imposed. But it does not list any other attempted homicide offense. Minn. Sent. Guidelines VI.

The general principle frequently applied to the construction of statutes is that the expression of one thing implies the exclusion of all others. *See County of Morrison v. Litke*, 558 N.W.2d 16, 18 (Minn.App. 1997). Although attempted second-degree murder is a crime of sufficient severity to justify permissive consecutive sentencing, this court must infer that the guidelines commission intended to exclude it. If the commission meant to include all attempted offenses, it would not have listed attempted first-degree murder as the only attempted homicide in section VI.

▮ In construing provisions of the sentencing guidelines, the supreme court has treated the guidelines as if they are a collection of statutes and has applied the rules of statutory construction. *See State v. Maurstad*, 733 N.W.2d 141, 148 (Minn. 2007). Thus, the rule of *expression unius exclusion alterius* that is applied to the construction of statutes would apply here. The general rule that penal statutes are to be strictly construed would also apply. *See generally State v. Colvin*, 645 N.W.2d 449, 452 (Minn.2002); *cf. State v. Zacher*, 504 N.W.2d 468, 473 (Minn.1993) (holding that rule of strict construction does not require narrowest possible interpretation).

Allowing permissive consecutive sentencing for attempts would tend to negate the policy favoring significantly reduced penalties for attempted crimes compared to those for the completed offense. The attempt statute, for example, includes a limitation on sentences for attempts to one-half the maximum sentence for the completed crime. Minn.Stat. § 609.17, subd. 4(2) (2006). This limitation not only recognizes the less-serious nature of an attempt as compared to a completed crime; it may also be intended to provide an incentive for offenders to desist in their criminal behavior, although we note that the statute also makes abandonment a complete defense to the crime. *See id.*, subd. 3 (2006). Most states provide reduced punishment for attempts. 2 Wayne R. Lafave, *Substantive Criminal Law* § 11.5(c), at 251–52 (2d ed. 2003). We find no evidence that the guidelines commission intended to depart from this general policy and make consecutive sentencing permissive for attempted crimes other than attempted first-degree murder.

We recognize that the supreme court has held that attempted crimes are to be treated the same as completed offenses for

purposes of sentencing enhancement under Minn.Stat. § 609.346, the former provision for repeat sex offenders. *State v. Ronquist,* 600 N.W.2d 444, 447 (Minn.1999). The court rejected the argument that because there was no similar extension of the definition for the *current* offense, the statute did not apply when the current offense was an attempt. *Id.* But in *Ronquist,* the statute contained a definition including attempts along with completed crimes, even though it was not a definition directly relevant to the issue presented. Here, there is no similar language in section VI from which to infer that the guidelines commission intended to include attempted crimes along with the completed crimes. And, as discussed above, the explicit mention of one attempted crime is presumed to indicate a contrary intent. Therefore, it was error to sentence Johnson to consecutive sentences for the attempted second-degree murder offenses against J.M.-L. and N.H.

The district court at sentencing did not indicate that there were any grounds for departure with respect to the crimes against J.M.-L. and N.H. The state did not argue for an upward departure or request that aggravating factors to support a departure be presented to a jury. Therefore, we conclude that the sentences for the attempted second-degree murder offenses against J.M.-L. and N.H. should be reduced to concurrent terms. We remand to the district court for appropriate modification of the sentence.

### DECISION

The district court did not commit plain error prejudicing appellant's substantial rights in allowing autopsy evidence. The evidence is sufficient to support the convictions of attempted second-degree intentional murder against J.M.-L. and attempted first-degree murder against L.H. The district court's plain error in failing to instruct on the elements of assault did not prejudice Johnson's substantial rights, and the court did not abuse its discretion in excluding defense expert psychiatric testimony. The court, however, erred in sentencing Johnson to consecutive sentences on the two counts of attempted second-degree murder. This error requires a remand for imposition of concurrent terms.

**Affirmed in part, reversed in part, and remanded.**