*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0265**

State of Minnesota,
Respondent,

vs.

Lue Moua,
Appellant.

**Filed January 20, 2026
Affirmed
Larson, Judge**

Ramsey County District Court
File No. 62-CR-23-6139

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Alexandra Meyer, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larson, Presiding Judge; Connolly, Judge; and Bond, Judge.

**NONPRECEDENTIAL OPINION**

**LARSON**, Judge

Following a jury trial, appellant Lue Moua challenges his convictions for kidnapping under Minn. Stat. § 609.25, subd. 1(3), deprivation of parental rights under Minn. Stat. § 609.26, subd. 1(3) (2022), and violation of a domestic-abuse-no-contact order

(DANCO) under Minn. Stat. § 629.75, subd. 2(b) (2022). First, Moua argues the state presented insufficient evidence to sustain the kidnapping conviction because the state failed to prove that he removed his biological child from the child's grandparents' house with the intent to terrorize the child's mother. Second, Moua asserts that he is entitled to a new trial on all the charges because the district court abused its discretion when it allowed the state to present relationship evidence under Minn. Stat. § 634.20 (2024). Because the state presented sufficient evidence to prove the kidnapping conviction and the district court did not abuse its discretion when it admitted the relationship evidence, we affirm.

**FACTS**

Respondent State of Minnesota charged Moua by amended complaint with kidnapping, deprivation of parental rights, and violation of a DANCO. The following factual summary is based on the evidence received at a jury trial.

Moua and mother were married in 2017 according to Hmong tradition but did not receive a government-issued marriage certificate. About three months later, the child was born. Initially, the family lived together, and Moua cared for the child when mother was at work.

When the child was around five years old, problems emerged in the parents' relationship. Moua was suspicious that mother wanted to be with someone else and threatened to "just kill [mother] or kill himself . . . so [mother] could just move on." At one point, Moua brandished a knife and threatened to carry out the threats. Eventually, the threats involved the child, with Moua suggesting that he would make the child "a

2

replacement" for mother, "do whatever [he] want[ed] with [the child]," and would even "sell" the child.

Soon after, Moua and mother ended their relationship. Mother and the child went to live with mother's parents (grandparents). Moua and mother did not have court-ordered custody or a formal parenting-time schedule, but mother agreed to allow Moua to see the child if he brought the child back to grandparents' house. Moua continued to threaten mother after she moved into grandparents' house. In January 2023, the district court granted mother's petition for a harassment restraining order (HRO). The HRO ordered Moua not to have contact with mother or go to her home, which at the time, was grandparents' house. Yet, Moua continued to go to grandparents' house to see the child.

On August 8, 2023, mother was working, and grandparents were caring for the child. Moua rode his bicycle to grandparents' house to take the child swimming. The child got in a wagon attached to the bicycle. When mother returned from work, Moua had not returned the child, and mother began to worry. Around 9:00 p.m., mother contacted Moua and told him to bring the child back to grandparents' house; Moua refused. Shortly thereafter, mother called law enforcement. A few hours later, law enforcement located the child with Moua in a tent near a park. There were various items in the tent, including a knife. Law enforcement returned the child to mother. Afterward, the child felt pain in their private parts; mother described that the private parts appeared "hot and red." The child never disclosed what caused the pain.

Following the August incident, the state charged Moua with violating the HRO. The district court also issued, and Moua was served with, a DANCO on August 11, 2023. Both mother and the child were listed as protected persons in the DANCO.

On October 14, 2023, Moua rode his bicycle to grandparents' house while mother was at work and, again, retrieved the child in the wagon.[1] Grandparents notified mother, and mother contacted law enforcement around 6:00 p.m. Mother was "stressed" while she spoke with law enforcement and told them she was afraid Moua would sell the child. While the child was gone, mother felt scared and worried that Moua would harm the child. Law enforcement found the child in the same location as the August incident and returned the child to mother. Two days later, the state charged Moua with kidnapping and deprivation of parental rights and later amended the complaint to charge Moua with the DANCO violation.

Prior to trial, the state filed a motion to admit evidence regarding the August incident as relationship evidence under Minn. Stat. § 634.20. Moua objected, particularly to the evidence regarding the child's private parts—arguing the evidence was "so serious, so extreme" that it would be unfairly prejudicial. The district court overruled the objection, allowing the state to admit the relationship evidence.

At trial, the state called mother, grandfather, and four responding law-enforcement officers, who testified consistently with the facts articulated above. Moua testified on his own behalf, explaining that his intent during both incidents was to spend time with his

---

[1] Grandfather testified that Moua told grandfather he was allowed to take the child, so grandfather allowed the child to leave.

child.  The jury returned guilty verdicts on all three counts.  The district court entered convictions on all three counts and then sentenced Moua to a 48-month prison term on the kidnapping count.  *See* Minn. Stat. § 609.035, subd. 1 (Supp. 2023).

Moua appeals.

## DECISION

Moua raises two arguments in this appeal.  First, Moua asserts the state presented insufficient evidence to sustain his kidnapping conviction and, accordingly, we must reverse that conviction.  Second, Moua contends the district court abused its discretion when it admitted the relationship evidence, requiring a new trial.  We address each argument in turn.

## I.

Moua first argues the state presented insufficient evidence to prove that he kidnapped the child under Minn. Stat. § 609.25, subd. 1(3).  As relevant here, a person is guilty of kidnapping if, with the "purpose[]" to "terrorize the victim or another," they "remove[] from one place to another, any person . . . under the age of 16 years, without the consent of the person's parents or other legal custodian."  Minn. Stat. § 609.25, subd. 1(3).  "Terrorize means to cause extreme fear by use of violence or threats."  *See State v. Schweppe*, 237 N.W.2d 609, 614 (Minn. 1975) (defining "terrorize" for purposes of the terroristic-threats statute); *see also State v. Franks*, 765 N.W.2d 68, 74 (Minn. 2009) (using the same definition of "terrorize" for purposes of the felony-stalking statute).

Here, Moua challenges whether the state presented sufficient evidence to prove that he had the "purpose" to terrorize mother.[2] The supreme court has held that the word "purpose" is "synonymous with intention." *State v. Wilson*, 830 N.W.2d 849, 853-54 (Minn. 2013). Accordingly, to sustain the kidnapping conviction, the state needed to prove that Moua had the specific intent to terrorize mother. *See id.*

We apply the sufficiency-of-the-evidence standard to address Moua's argument. *See State v. Salyers*, 858 N.W.2d 156, 160 (Minn. 2015). To do so, we must first determine whether the state used direct or circumstantial evidence. *See State v. Horst*, 880 N.W.2d 24, 39 (Minn. 2016). Direct evidence is "based on personal knowledge or observation and . . . if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotation omitted). Circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *Id.* (quotation omitted).

The parties contend, and we agree, that the state relied on circumstantial evidence to prove Moua intended to terrorize mother. *See State v. Clark*, 739 N.W.2d 412, 422 (Minn. 2007) (noting that intent is "generally proved circumstantially—by drawing inferences from the defendant's words and actions in light of the totality of the circumstances"). Accordingly, we apply the heightened two-step circumstantial-evidence standard. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012). First, we "identify the

[2] The state alleged Moua acted with the purpose of terrorizing either mother or the child. Moua argues that the state failed to prove he intended to cause great bodily harm or terrorize the child or mother. In its brief, the state argues only that the evidence was sufficient to prove Moua had the purpose to terrorize mother.

circumstances proved." *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). The circumstances proved are "a subset of facts" identified "by resolving all questions of fact in favor of the jury's verdict." *Harris*, 895 N.W.2d at 600. "[W]e defer to the [factfinder's] acceptance of the proof of these circumstances" and "assume that the [factfinder] believed the State's witnesses and disbelieved the defense witnesses." *Silvernail*, 831 N.W.2d at 598-99 (quotations omitted). Second, we determine whether the circumstances proved, in their entirety, "are consistent with guilt and inconsistent with any rational hypothesis except that of guilt," and "not simply whether the inferences that point to guilt are reasonable." *Id.* at 599 (quotations omitted). During this step, we do not defer "to the fact finder's choice between reasonable inferences." *State v. Andersen*, 784 N.W.2d 320, 329-30 (Minn. 2010) (quotation omitted). The circumstantial evidence the state presents "must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotation omitted).

Beginning with the first step, as relevant to Moua's intent, the state proved the following at trial: (1) Moua and mother were culturally married in 2017; (2) the child was born during the cultural marriage and Moua is the child's biological father; (3) Moua and mother separated when the child was five years old; (4) before and after the separation, Moua threatened to harm both mother and the child; (5) mother and the child lived with grandparents after the separation; (6) the district court issued an HRO in January 2023, prohibiting Moua from going to grandparents' house; (7) on August 8, 2023, Moua removed the child from grandparents' house; (8) Moua refused to return the child and,

7

following law-enforcement intervention, the child was found with Moua in a tent near a park; (9) a knife was found in the tent; (10) after law enforcement returned the child to grandparents' house, mother observed the child had pain, and their private parts were "hot and red"; (11) Moua was charged with violating the HRO; (12) on August 11, 2023, the district court issued a DANCO, specifically prohibiting Moua from contacting the child or going to grandparents' house; (13) on October 14, 2023, Moua removed the child from grandparents' house; (14) when mother learned Moua had taken the child, she was worried for the child's safety; and (15) law enforcement located the child with Moua at the same tent near a park.

Moving to the second step, Moua does not contest that the circumstances proved are consistent with guilt. Instead, Moua asserts that the circumstances proved are consistent with a rational hypothesis other than guilt—namely, that he only intended to spend time with the child. We are not persuaded. First, when we analyze the circumstances proved, we preserve the jury's credibility findings. *See Harris*, 895 N.W.2d at 600. Here, Moua testified that, when he removed the child, he only intended to spend time with them. The jury's guilty verdict indicates that they did not find this testimony credible. And even without this adverse credibility determination, Moua's prior threatening statements to mother, the HRO, the DANCO, and mother's reaction both times Moua took the child from

grandparents' house,[3] all support only one reasonable inference—that Moua intended to terrorize mother when he removed the child.

For these reasons, we conclude the state presented sufficient evidence to prove Moua had the purpose to terrorize mother, and we affirm the kidnapping conviction.

## II.

Moua also argues he is entitled to a new trial because the district court abused its discretion when it allowed the state to admit evidence that the child had "hot and red" private parts following the August incident (the private-parts evidence). We review the district court's evidentiary decision for an abuse of discretion. *State v. McCoy*, 682 N.W.2d 153, 161 (Minn. 2004). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Hallmark*, 927 N.W.2d 281, 291 (Minn. 2019) (quotation omitted). "[W]e largely defer to the [district] court's exercise of discretion in evidentiary matters and will not lightly overturn a [district] court's evidentiary ruling." *Dolo v. State*, 942 N.W.2d 357, 362 (Minn. 2020) (quotation omitted). Moua bears the burden to establish that the district court abused its discretion and that he was prejudiced as a result. *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).

Here, the district court permitted the state to admit the private-parts evidence under section 634.20. Evidence offered under section 634.20 is known as "relationship

---

[3] A "victim's reaction to the threat is circumstantial evidence relevant to the element of intent." *Sykes v. State*, 578 N.W.2d 807, 811 (Minn. App. 1998), *rev. denied* (Minn. July 16, 1998).

evidence." *State v. Zinski*, 927 N.W.2d 272, 273 (Minn. 2019). Relationship evidence is "[e]vidence of similar conduct by the accused against the victim of domestic abuse," and it is admissible "unless the probative value is substantially outweighed by the danger of unfair prejudice." Minn. Stat. § 634.20.

Moua primarily argues that the district court abused its discretion when it admitted the private-parts evidence because it had little probative value and was unfairly prejudicial. Moua contends the private-parts evidence lacked probative value because no evidence was presented that the child's pain was attributable to him. And, according to Moua, the testimony is highly prejudicial because the jurors likely inferred, without any evidentiary basis, that Moua sexually assaulted the child. We are not persuaded.

In deciding to admit the private-parts evidence, the district court determined the evidence was probative because it would "illuminat[e]" the relationship between Moua and the child, and "provid[e] context for the situation," specifically, how Moua's actions in October demonstrated an intent to terrorize mother. This determination is consistent with caselaw. *See, e.g.*, *State v. Valentine*, 787 N.W.2d 630, 637 (Minn. App. 2010) ("[T]he rationale for admitting relationship evidence under section 634.20 is to illuminate the relationship between the defendant and the alleged victim and to put the alleged crime into the context of that relationship."), *rev. denied* (Minn. Nov. 16, 2010). And we agree with the district court that the evidence was probative to show the relationship between the family members, to demonstrate why mother feared for the child's safety, and to assist the jury with evaluating Moua's credibility. *See McCoy*, 682 N.W.2d at 161 (affirming admission of relationship evidence that "assisted the jury by providing context with which

10

it could better judge the credibility of the principals in the relationship"); *see also State v. Lindsey*, 755 N.W.2d 752, 757 (Minn. App. 2008) (recognizing "significant probative value" of relationship evidence "in assisting the jury to judge witness credibility"), *rev. denied* (Minn. Oct. 29, 2008).

The district court also determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. While the district court found the evidence was "unquestionably prejudicial," it specifically determined that the evidence was not "unfairly prejudicial" because it "would [not] tend to persuade by illegitimate means." *See State v. Bell*, 719 N.W.2d 635, 641 (Minn. 2006) (stating, "unfair prejudice is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage") (quotation omitted); *see also State v. Boswell*, 20 N.W.3d 640, 653 (Minn. App. 2025) (finding no abuse of discretion because admitted testimony of domestic conduct, in context, fell within the scope of section 634.20 and did not persuade by illegitimate means). Because the district court weighed the probative value against the danger of unfair prejudice, the district court properly exercised its discretion.

Further, we have repeatedly concluded that "[t]he likelihood of unfair prejudice from relationship evidence may be lessened by making a cautionary instruction to the jury." *Boswell*, 20 N.W.3d at 653 (citing *State v. Benton*, 858 N.W.2d 535, 542 (Minn. 2015)); *see also State v. Andersen*, 900 N.W.2d 438, 441-42 (Minn. App. 2017) (observing that "cautionary instructions lessened any probability that the jury would rely improperly on relationship evidence"). Here, the district court offered several cautionary instructions to

11

the jury to lessen any unfair prejudice.[4]   During mother's testimony, the district court instructed the jury that the "evidence [was] being offered for the limited purpose of demonstrating the nature and the extent of the relationship between [Moua] and his family in order to assist [the jury] in determining whether [Moua] committed the acts with which he [was] charged" and that the jury was "not to convict [Moua] on the basis of the conduct." The district court repeated similar instructions during an officer's testimony, and during final instructions to the jury.  We presume jurors follow the district court's instructions. *See State v. Matthews*, 779 N.W.2d 543, 550 (Minn. 2010).

For these reasons, we conclude the district court did not abuse its discretion when it allowed the state to admit the private-parts evidence under section 634.20.

**Affirmed.**

---

[4] Moua also argues the district court's cautionary instructions "exacerbated," rather than lessened, the potential for unfair prejudice.  As authority for his claim, Moua relies on *State v. Strommen*, 648 N.W.2d 681 (Minn. 2002) and *State v. Fardan*, 773 N.W.2d 303 (Minn. 2009).  Both cases are distinguishable and do not persuade us that the district court abused its discretion.  In *Strommen*, the supreme court addressed a curative rather than a cautionary instruction, 648 N.W.2d at 687, and in *Fardan*, the evidence was *Spreigl* evidence, not relationship evidence under section 634.20, 773 N.W.2d at 317.  Moreover, the instructions in this case were well tailored to Moua's concern for how the evidence might be used to persuade by illegitimate means.